20-1189 Infinity Computer Products v. Oki Data Americas. Mr. Genova, we're ready when you are. Thank you, Your Honor, and may it please the court. We are here today to first address a technical misinterpretation of a passage from the prosecution history that conflates a passive link and the data that flows through that passive link. The second and related legal question before the court is whether a single alleged ambiguity from one paragraph in a 22-and-a-half-year prosecution history invalidates all subsequent issued and asserted claims, particularly whereas here there's over 15 years of subsequent prosecution history, including an explicit definition of the very term at issue, passive link, offered by the applicant and adopted by the PTAB explicitly on appeal, forming part of the salient prosecution history in connection with reexaminations of all actually asserted claims in the case. And the claim language of all 26 asserted claims and the specification all support Infinity's construction. Mr. Genova, this is Judge Taranto. Can I ask you this? It seems to me as I think Judge Stark said in his opinion that in your colloquy at oral argument, you agreed that a skilled artisan, in order for this language to be definite, would need to know where the passive link ended and the computer began. If that's right, then there would seem to be a kind of analogy to Teva here, which is the claim language by itself, and I think I would say your 2004 express definition leave unclear the answer to that question, where one ends and the other begins. And you therefore need something to resolve the uncertainty and the role of the prosecution history here is to search for something that resolves that uncertainty and what you find when you look at it is actually something maybe not as stark as in Teva, but you find something resembling an inconsistency in any event, not a resolution. Why is that not what is going on here? Yes, thank you, Judge Taranto. So first of all, I think we need to appreciate that there is a distinction, and this is vital to the case, between the data flow and the link and that these are different constructs. So a link, all of the links disclosed in the patent specification are cables, and these cables run from a facsimile machine to a computer. And all of the prosecution history, including the very office action response to which they allude on September 26th, 2002, says that the link runs from the facsimile machine to the computer. In fact, if you look at the September 26th, 2002 example, it's even made more explicit because at the time they were arguing against a reference called Perkins, the principal embodiment of Perkins was that there was a box that sits in line between the facsimile machine and the computer, and the secondary one was a card. And the patent applicant was extremely explicit, saying that the computer begins at the interface. So I would respectfully posit, Your Honor, that even the very office action that they're talking about is completely explicit. It says that the passive link terminates at the computer interface. And in referencing this secondary embodiment of Perkins, what the applicant said is even though circuitry of device three, and this is again in reference to the second embodiment of Perkins, is placed in a card within a box containing the computer, so regardless of where the plastic box of the computer is, it is a peripheral device to the computer, i.e. not part of the computer, which processes data before it is transmitted to the IO bus. So going back to what the district court actually said, is the office action response repeatedly mentions the IO bus as the endpoint of the link. If you look at what the citations by the district court to that statement are, is there's one citation, and you will never see anywhere in the prosecution history, including to that citation, any reference that the passive link ever went to the IO bus. What was actually said is the following, Your Honor, the non-intercepted data, I'm sorry, I'm hearing a slight echo, the non-intercepted data enters through the serial type connector port of the computer. So the very passage that the district court relies on says that the connector port of the computer, so that's And this is the passage at Joint Appendix 2201? Yes, Your Honor. So that very passage that they claim is an ambiguity is not, because the intercepted data enters the computer at the connector port, according to that passage. And so we've used the example of traffic, vehicular traffic across a tunnel or bridge. Yes, the bridge has a beginning and an end, and these are well-defined, but the vehicular traffic passes through it. Another example that occurred to me is if we had a claim directed to a kinkless hose and said that the non-intercepted water flow allows you to water your vegetable garden, no one would understand that statement to mean that you have to shove your hose into the vegetable's roots. There's a distinction between that which traverses the passive link and the link itself. And so all of the prosecution history, and interestingly, Okie Data agrees with the exception of this sole example, but to my understanding, about all of the prosecution history indicates that the passive link starts with the facsimile machine and ends at the claim 27 that was under discussion in this very office action. So there is no ambiguity where the passive link begins or ends, and the only confusion, unfortunately, was the confusion between data transfer, data flow, and the cable or passive link. And in the words of the patent specification, the data transmitted can be received as a picture. So this just sort of reinforces that what we're talking about with the data flow, and again, of course, in the beginning of that is a facsimile machine, so you have a picture, that has nothing to do with the physical construct that is the passive link. Again, the passive link and the embodiments are simple cables, and there is no repeated reference. There's not a single reference that the passive link goes to the I.O. bus. And your Honor mentioned Teva. In that case, the claims did not identify any or provide any assistance in terms of what the meaning of the molecular weight might be. There were multiple molecular weights. We put this in our reply brief, but for example, the 574 patent claim one has two different elements. The first is establishing the communication path, namely the passive link, and the second is transferring data from the facsimile machine to the computer. So these are different things. There is no conflict. Can I ask a perhaps quite minor question? Chief Judge Stark noted that in the reexamination, the PTAB had no occasion to attend to this question of what to make of the September 20, 2002 distinction of Perkins. The reexaminer did, because RICO raised that to the reexaminer, and the reexaminer evidently did not find that to be a problem. If the reexaminer had thought that there was an inconsistency between what was then being argued and what had been said in distinguishing Perkins way back in 2002, what could the reexaminer have done in a reexam proceeding in which indefiniteness is not one of the permissible grounds? Well, that's a good question, Your Honor. I do know that the reexaminer may say that there was a lack of written description or made some other finding that it was unclear, there was insufficient information within the intrinsic record. But I, first of all, the preliminary or the main prosecution, this issue was never raised. There was no confusion expressed during, by any prosecutor in this 22 and a half years. And then there was the explicit definition adopted during reexamination and on appeal. And I would point out that How do you think that that explicit definition resolves this question of where one thing ends and the other begins? Well, that explicit definition coupled with the PTABs walking through figures 2B, 2C, 2D, and 2E, which the 2E, incidentally, the PTAB concluded did not show a passive link between the facsimile machine and the computer. Each of those, and if you look at those diagrams what you will see is an RJ11 cable or an RS222 cable that is between a facsimile machine box and a computer box. And that is the extent of the passive link. And the PTAB walked through with that passive link definition in hand and said, each of these three is a passive link. So taking head on what a passive link is and where it begins and ends, and this one is not a passive link. And in answer to your question, I think in terms of what the role of the definition is in the Conval versus Compact case, post-grant prosecution history can be highly relevant in terms of Oh, I think my question was, assuming it can be, but it's not clear to me that the language in the definition advances the ball at all on figuring out where one ends and the other begins. Okay, Your Honor, I appreciate the question. So the first is that the patent speaks to the PC being a conventional PC. And so in each instance, the conventional PC is depicted in figures 2B through 2C as a box that's called a PC-type computer. And the outside or the inside of that computer would be an interface or port. And unlike in TEBA, there's also a disclosure, for example, at Column 8, Line 11, that the PC begins at an RS-232 connector. So here we have all of the intrinsic record with the claimed exception of this prosecution history passage, which in fact is not, is actually corroborative and consistent with And I would conclude, Judge Stronto, by simply mentioning that the only person of ordinary skill of record, Dr. Levitt, testified consistently with Infiniti's position. There was also another person of ordinary skill who testified in a related case on behalf of the defendant consistently with Infiniti's position. And there is no evidence from a person of ordinary skill in the record that would corroborate this technical misunderstanding adopted by OKI Data and subsequently by the District Court. And unless there are any questions, I'll... Mr. Deneau, Judge Clevenger, you were talking about patents speaking to a conventional computer. The conventional computer would also include such a thing as in Perkins, the card that was inside the computer? Well, so in the context of this particular... That's a yes or no type question. Well, the Perkins card would not be present in a conventional computer. Absolutely not. Why not? Well, all of what Perkins says, the Perkins... Can't things be put in a conventional computer and not make the computer non-conventional? So, there's two embodiments of Perkins. The one is what I would call, well, he calls it a device three in both instances, that the first is sitting in line between... That's true. And that's not a problem for you. The problem for you is your Achilles heel is the card that's inside the computer. Right. And that was a directly addressed... Necessary for you to argue that the computer doesn't begin until the end of the card, if you will. Right. And that was what was said in the very same prosecution history passage. What the applicant said very clearly was, I don't care where the plastic case of the computer is, the computer begins at the computer interface. So, the claim itself said computer interface. And what the patentee said during the prosecution history, this very same passage, is that a card that is plugged into the computer interface is not part of the computer. Who said that? The patentee said that at, and I can read you the precise language, hence, even though the circuitry of device three is placed in a card within the box containing the computer. So, clearly, the computer is a separate thing in the box. It should be regarded as a peripheral device to the computer, which process the data before it is transmitted to the I.O. bus of the computer. So, the very same passage on which they rely and the computer interface language addresses, Your Honor, this issue that you're raising and throughout the entire prosecution... I'm sorry. This is Judge Taranto. I'm sorry. I know your clock is run, but didn't what you just said highlight the problem rather than resolve it? Because that is what figures 2B through D do not seem to show at all. Well, exactly. We do not show in figures 2B or through D a device. So, I think the distinction maybe that's missing here is that in the 811 patent, what they do in the figures 2B, 2C, and 2D, what is discussed is an internal card. So, that is not something that is plugged in like Perkins. Every embodiment of Perkins has analog coming in and digital coming out and a processor and a fax modem that processes the data before it is transmitted to the computer. So, figures 2B, 2C, and 2D do not have that because they... Explicitly, there is an internal device in those figures. And in addressing, I think the implication of your question doesn't display into the IOBUS argument. Again, we have to differentiate the data flow and the permissive ability. And the real benefit, I think it bears out saying, and I appreciate the court's indulgence on time. So, please cut me off whenever you've had enough of my discussion. But the real benefit here is that the passive link doesn't require all this processing. And what Perkins showed, and it was... First of all, it required analog transmission, and this was specifically found by the PTAB, that Perkins was not a validity problem relative to Claim 27, even as it existed at that time. And it was amended four times subsequently. That all of the Perkins had analog coming in and digital coming out, and that was not what was claimed. The benefit of the claim was that there was digital from the facsimile machine to the interface of the computer. And that was clearly delineated. I think I'm going to cut you off here because we're getting a little beyond what the line of questioning was. But we'll reserve some time for rebuttal, and let's hear from the other side. Thank you so much, Chief Judge. Thank you. Yes. May it please the court. This is Mark Labgold on behalf of the defendant, Appley Okedata Americas. The simple issue, in its simplest terms, I should say, is whether the positions taken by the applicant during prosecution with regard to the computer's endpoint of the applicant coined term passive link was inconsistent with the positions the patent owner took with respect to the same computer endpoint during the reexamination of the 811 patent claims. The district court found that during prosecution, as the court's already noted, there- Mr. Labgold, can a patentee change its mind? I mean, why doesn't the latter statement control? This is over a period of years, and why is he precluded from changing his mind? Well, certainly a patentee could change its mind, and the patentee could have taken different arguments at different points in time. But, Your Honor, the issue was when the patentee in this point changed its mind, it took a completely inconsistent position that changed the endpoint of the passive link. There's nothing wrong with changing your mind. Well, in your view, that would create a problem of validity with respect to Perkins at the end of the day, right? Well, it does create- It's not a question of whether it creates the position of validity at the point in time. There's a definitional point to overcome the prior art, and so that's with Perkins during prosecution. During reexamination, we're confronted with a totally different issue about whether or not they could antedate Ken Mochi. That endpoint changes. So the question for the public is, looking at the intrinsic record as a whole, how do I know where it ends? Because there's no disclaiming, there's no explaining, there's no harmonizing, because there simply is no ability to harmonize it. One of ordinary skill in the art. Okay, please. Well, if you just take a- This is Judge Post again. If you just take a step back, shouldn't we defer to the PTO on that, and shouldn't we say it's the PTO's job on round two to reconcile the two and give any deference to them if it's clear that, for whatever reason, I understand this was an ex parte proceeding, but they didn't see a disparity or discrepancy between the two positions? Well, as I believe it was Honorable Judge Toronto that raised the point and asked the question of my opposing counsel, is indefiniteness is not something which the court could address, I mean which the PTAP could address at that point in a reexamination. I'm sorry, but it could have re-raised Perkins, couldn't it? They could have re-raised Perkins. I don't think that would have been a problem. You think Perkins would not have been a problem, or you don't think that would have been a 301 problem? I think that, I'm sitting here trying to figure out, the PTAP could have, they could have remanded it, and they could have instructed them to take it in light of Perkins. I do believe they could do that, and that they did not do. But they did not address the indefiniteness issue. Let me ask you another more general question. We deal with prosecution histories in a lot of cases, and unfortunately sometimes we are forced to conclude that they're full of inconsistencies, and so we can't rely heavily on them. So the question for us is, when is indefiniteness created? Is it your view, just as kind of a legal matter, that to create indefiniteness you need a clear disclaimer or lexicography, or is the standard softer than that? We don't need a disclaimer. In this case, I do believe there is a disclaimer which occurred. In this case, we have a lexicography issue where the passive link wasn't defined. The passive link doesn't fall in the specification. The passive link was introduced after several arguments were unsuccessful. Notably, when you look at figure 2E of the 811 patent, it's undisputed that that has an intervening right. And that's what Perkins showed. Now, if you take that intervening device and you put it on a card internally, that's what Perkins showed as its internal, which the passive link language was introduced to overcome. And there is an admission in the record that that overcame the rejection. And at column 6, at 6-11, referring to in the 811 patent, we have a discussion that figure 2B is on its own printed wiring cord. So again, it's a card that's been inserted. So figure 2B is the internal configuration of Perkins, where 2E is the external configuration of Perkins. And I would go so far as to say that there was no inconsistency and there was no ambiguity at the close of the prosecution. The record is very clear that it ends at that I.O. bus, and even if you put the card on the inside, it's going to be considered this peripheral device. And importantly, I think the court should look at the fact that in the amendments, when the patentee was distinguishing Perkins, he doesn't refer to figures 2A, 2B, 2C, 2D, 2E. It's always with regard to 2F, 2G, and 2H. Now, what happens is it's in the re-exam when they're forced to antedate Kenmochi because they can't get around that prior art. That's where the indefiniteness occurs. This is just Toronto, and the joint appendix is unfortunately rather long. I thought that there was, in fact, some reliance before re-examination on some of the figures, including in discussing Perkins before F. Is that wrong? When they distinguish, for example, in the office action dated July 20, 1999, this is Appendix 1305, there's a discussion regarding Claim 27. The amended Claim 27, the following denotes the significant differences between Perkins' patent and the applicant's patent application. It then goes through and it explains some details. In contrast, the applicant can transfer digital signals between the vaccine-only transceiver and the computer in accordance with the applicant's specification, numerous claims, and is delineated in figures 2F, 2G, and 2H. I think maybe what I'm thinking about is the November 2004 invocation of 2B through D for priority for the passive link. Is that an antedate shlank or something? Have I got that confused? I'm sorry. The dates sort of float around in my head.  Let me just give me a moment to look at 2245. I think I know where you're referring. This is in the table. Oh, no, that's not. Yes, this is the 2245 part of some document received November 24, 2004, amendments, explanations, et cetera. It's your Exhibit 27, and it says right at the bottom of 2245, inherent features of the 558 shown in figures 2B, 2C, and 2D. This is all I seemingly could distinguish, the shlank and the whole wig. That's not Perkins, but is it? It's a different issue that's being raised here, and it doesn't address the same point. They do rely on 2A and 2B showing the bidirectional, but this is in relation to the isolation from the public network. Okay, can I just switch topics and ask you what? I guess I think of this as a practical question, and this appears to have been conceded in the colloquy with Chief Judge Stark, but put aside the concession. If you're a company that wants to do something in the neighborhood of these claims, the claims that are at issue, and you want to do something that meets all of the other claim limitations in the claim, so the digital and everything else, what as a practical matter would you be uncertain about if you couldn't tell where the point of separation is between the passive link and the computer? Well, the answer to that is, in simple terms, is that I'm saying that I've got all these other limitations in there, just like you've said. Now I want to know, are there additional things that I can add which are present in my device that I want to market? And as we're sitting around and saying, well, if we put it outside the box, that clearly everybody agrees is going to be not a problem. So let's just put it on a card and put it inside. And so it looks like on the outside of the computer box it's just a port, and this is there, so that can't be infringement. Well, that is infringement if you use the guidance of the prosecution history during prosecution, but that would not be infringement if that was the question being asked looking at the definition, as it turns out from the reexamination. So there is a practical significance as to whether or not something can, in fact, some processing element, some intervening apparatus, some intervening device, intervening circuitry that intercepts, modulates, demodulates, or processes signals. Or another way they put it, an active component between the fax machine and the computer. And so in one instance I can just get around it. I'll just put it in the box. But that runs you into the conflict. Did that answer your question? Yes, it does. Thank you. Can I shift gears a little? And this question may seem in the weeds to you, but it's not in the weeds for people who are thinking about having to write opinions. The way the case was presented to Judge Stark, he had two terms, passive link and computer, and found them kind of independently indefinite, each term. Computer is a familiar term with an ordinary meaning. So I'm wondering if it's necessary to hold computer indefinite if we hold passive link indefinite. And the second question I have is that one could have just as easily talked about the entire phrase, which includes both passive link and computer, and not sort of divvied up passive link and then computer as a separate category. So could you just give me your view on both of those questions, on both of those points? Absolutely. And thank you, Your Honor. And I don't want to sound like a conspiracy theorist, but it's like you listened in on a conversation. Because my first concern was when my colleagues raised that they wanted to have the term computer interpreted, is that as a general matter this Court has been very clear. When you say computer, it's a generic computer. So how are we going to ask this Court to say that the computer is indefinite? And the concern was is that because of the fact that the passive link, as it's defined as what its ends are, have to be relative to something. Now, in hindsight, the way you phrased it is, would it have been easier to interpret it as the entire phrase, the two terms only get linked to each other because of the fact of the definition of where the computer starts and where the computer stops. So in the normal sense, it is a computer, and it's described as a general computer. It's like there's nothing special about it. But it's that connection to it, because most people would normally think that it's like, oh, I plug it in. What does it mean I plug it in? And that's where the problem arises. And it's the question that Judge Stark asked, which was answered in the affirmative, was, you know, am I correct for someone to understand, the point of ordinary skill in the art, for these claims to be definite, one of ordinary skill in the art has to be relatively certain of what the endpoints are. And the answer was yes. And so that framed up the issue that those endpoints are important. And so I suppose you could find passive link by itself indefinite, if it's indefinite with the explanation, because it didn't say where it was supposed to end. And it's kind of a, you know, they became strangely inextricably linked. But I understand exactly what you're saying. And I sympathize with you, because I had the exact same question as how best we should be framing it to the court. And so it is not in the woods. Judge Clevenger, what's your answer? Why is computer, if an ordinary computer can include Perkins card, then why is computer indefinite? Well, again, I think this is a unique situation. And I think it may be belt and suspenders. So if the term passive link is found to be indefinite, because its endpoints cannot be discerned as to what the endpoint is on the computer end, then that would solve the problem. It's indefinite, because on the one hand, the passive link ends at the port on the computer. And on the other hand, it ends inside the computer on the far side of the card. Exactly. Either one of those hypotheticals, why does that make computer indefinite? And I would agree with you. The computer doesn't care where the passive link opens, starts, or stops. In some computers, it would stop at the port on the outside if there wasn't a card inside. In other computers, if they are conventional with a card inside, it would stop on the far side of the card. And I wholeheartedly agree with you. This is Judge Toronto. Can I just ask you, what do you say very specifically about Mr. DeNovo's argument that if you look at the language of the September 2002 filing that gave rise to the problem, that it actually does not ever say that the passive link goes all the way to the input-output bus. In fact, it's being misread, because the language is only about the data flowing. It doesn't say that the passive link actually goes all that way and that indeed other language in that same document seems to reiterate that the passive link ends at the interface. Well, the way the passive link has to be defined is it's an intervening device, intervening circuitry, intervening apparatus. It's an active component that intercepts, modulates, demodulates, or processes signals. So there is an inconsistency because what happened was, and that was not just talking about the data. I mean, it has to talk about the data in the context of the data flows through the passive link. But remember what this is in response to is that we have a situation where that intervening device was put onto a card and put inside the computer. And in response to that, the applicant made clear that even if you put it inside, it doesn't matter because the passive data, what we're talking about is there's no non-intercepted signal. There's no interrupted link between the facsimile machine and the IO bus. And it's very clear that that's when you look at the context in which it had to obviate that internal configuration of Perkins. And when you look at Perkins and you look at the language in column nine, for example, the facsimile device may be provided on a card for location in the computer. I mean, it's exactly, we're talking the same thing. And so what does it mean that it's at the end of it? It had to be the IO bus, and they distinguished it. They say it explicitly. Sir, as Judge Clevenger, are these claims necessarily limited to a physical cable connection between the fax machine and the computer or would a wireless connection between the two be within the scope of the claims? No, it's always in discussion of a physical connection. I don't think that there's any way that that would happen wirelessly. Technically possible, it's just you say the patent's limited to the physical connection. So, having not looked at the claims because this is an issue as presented, I would think it would raise additional issues, Your Honor, simply because there would need to be a receiving device inside the computer which processed the signal before it got to the computer. It might be stuck on the outside. Yeah. Even if it's stuck on the outside, it's still intervening between the fax machine and the computer. It would be a signal processing device. I don't think it could actually work in a wireless fashion. I think it actually has to be a direct connection now that I think it through. Otherwise, it's an intervening device. Thank you. Thank you. Thank you, Your Honor. We will restore, Mr. Genova, we'll restore three minutes of rebuttal, and I think that keeps the time pretty even, so that's good. Proceed with your rebuttal. Thank you, Your Honor. So, first, I just wanted to point out because there seems to be some discussion or interest in the notion of the one-line disclosure in Perkins that it can be in the computer. And so I would point out that what the applicant understood by this one-line disclosure, and it's one of those sort of patent lawyer techniques where they say at the end of their patent, immediately before the claims, by the way, we could put it in the computer. And so what the applicant was left to guess about that is that it was a card, because a Perkins card was a unique card. It was nothing that anyone had ever put in a computer before. It was a device that had special processors. And that that was plugged into the computer interface. And so that's how the patentee addressed that by saying that plugging it in the box, it still is not part of the computer. It is a peripheral to the computer was the language adopted by the patentee. And this was a distinction that was noted in the patent application, in the specification. So, for example, if you look at the 811 patent, column 6, lines 24 through 37, they talk about the present invention is mounted upon its own printed wiring board internal to the computer. That's my editorial, but it's a printed wiring board and arranged within the PC-type computer and is electrically connected to the internal facsimile modem. And it says, alternatively, it may be placed on a printed card of approximately a credit card size for insertion in a bus slot, i.e. a computer interface. So that second embodiment of figure 2D is more approaching Perkins. But that is not what is claimed. What is claimed is a passive link and that the endpoints were always crystal clear. And I appreciate, Judge Toronto, you're asking that very critical question because there is never a single instance where the passive link endpoint is defined as an I.O. bus. And I would direct the court's attention to Appendix 2158 where it says the digital signal enters the RS-232 or parallel-type connector ports between the facsimile and computer. And there is, again, 2158. And finally, just to address one comment that I think Judge Toronto may have raised, Perkins was discussed by the PTAB in the decision on appeal. And so there was some discussion by the district court that this would have been negatory. And I agree with Chief Judge Prost's analysis. And, frankly, we would invite that analysis under Sections 102, 103. It's not an issue. And the PTAB specifically said, we find unavailing the examiner's allegations that statements made during the prosecution to overcome a rejection of Perkins allegedly conflict with what was made in this proceeding. What's the citation for what you're reading from? 2692. Perkins did not teach or suggest a direct transfer of digital signals in light of its analog-only emphasis on original configuration to overcome a prior art rejection. So there is explicit finding by the PTAB that the Perkins reference did not anticipate, contrary to the negatory dicta from the district court, did not anticipate even Claim 27, which, again, is not a claim that is asserted. They were amended four times or more in subsequent prosecution in accordance with Judge Prost's point. Okay. Thank you. We thank both sides and the case is submitted. Thank you, Your Honor.